

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SETH MORGAN,

                 Petitioner,

      v.

UNITED STATES OF AMERICA,

                 Respondent.

CASE NO. C18-374 MJP

**AMENDED** ORDER ON § 2255 MOTION[1]

The above-entitled Court, having received and reviewed:

1. Petitioner's Amended Habeas Petition (Dkt. Nos. 21, 26[2]),

2. Government's Response to Morgan's Second Amended Motion to Vacate, Set Aside, or Correct (Dkt. No. 24),

---

[1] Following the issuance of the original order (Dkt. No. 33) in this case, Petitioner filed a Motion to Set Aside Order and Final Judgment, calling to the Court's attention that Rule 11(a) governing 28 U.S.C. § 2255 proceedings states that "[t]he District Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and that the Court's order had failed to do so. That motion is GRANTED, and this amended order corrects that oversight.

[2] Petitioner submitted his first amended petition on July 26, 2018 (Dkt. No. 21), but it was so badly out of order that the Court directed him to resubmit a properly-sequenced copy (Dkt. No. 23), which he did on August 30, 2018. (Dkt. No. 26.)

3. Petitioner's Reply to the Government's Answer (Dkt. No. 31),

4. Petitioner's Motion for Discovery and Production of Documents Pursuant to Rule 6 Governing 28 U.S.C. 2255 Proceedings (Dkt. No. 32)

all attached declarations and exhibits, and relevant portions of Petitioner's record in this matter and the underlying criminal case, rules as follows:

IT IS ORDERED that no evidentiary hearing is necessary in this matter.

IT IS FURTHER ORDERED that the Petition is DENIED.

IT IS FURTHER ORDERED that a Certificate of Appealability in this matter is DENIED.

IT IS FURTHER ORDERED that Petitioner's Motion for Discovery and Production of Documents Pursuant to Rule 6 Governing 28 U.S.C. 2255 Proceedings (Dkt. No. 32) is STRICKEN *sua sponte*.

**Background**

Factual History

The long and winding road which brings Petitioner back before this Court began with the November 17, 2013 theft of twenty-eight firearms from a Fred Meyer Store in Snohomish, Washington. (Dkt. No. 24-1, 5/5/15 Hearing at 7-8.) A man named Elshaug admitted to the theft and identified two other individuals (Herz and Baron) as the purchasers of the stolen weapons. (Id. at 13-15.) Elshaug told the police that he was present when Baron sold his portion of the firearms to a white male whose name Elshaug thought might be "Ryan" or "Brian." (Id. at 16-17.)

Questioned by the authorities, Baron admitted to purchasing the stolen guns and selling them to an Everett drug dealer he knew as "Boo-yah." (Id. at 19-22.) The Snohomish County

Sheriff's Detective investigating the burglary (Det. Conley), contacted the Everett Police Department ("EPD") and was told by EPD Officer Bennett that "Boo-yah" was Petitioner's street name. (Id. at 24, 113-114.)[3]  Although the Government claims in its briefing that Elshaug and Baron both identified the buyer of Baron's guns as Petitioner from a photograph they were shown (Dkt. No. 24 at 6), in fact the AUSA acknowledged during the course of the criminal prosecution that only Elshaug made the identification from the photo; Baron was never shown a picture of Petitioner and asked if that was "Boo-yah." (CR_103 at 4.)[4]

At the time of the firearms theft, Petitioner was on DOC supervision and there was both an active DOC warrant out on him for failure to report and an additional warrant for identity theft. (Ex. 1 at 204-206.)  Officer Bennett testified that he had recently interviewed a confidential informant ("CI") who had provided information regarding the Everett neighborhood (on the north side of town) in which Petitioner was residing and the car that he was driving (a Pontiac).[5]

Bennett began surveilling the north Everett area and, a week before Petitioner's arrest, observed the Pontiac described by the CI parked behind at eight-unit apartment building at 3322 Lombard Avenue. (Pre-Sentence Investigation Report ["PSIR"], CR_190 at ¶ 8.)  In the ensuing week, Bennett continued to conduct surveillance at the Lombard Avenue location; in addition to observing the Pontiac parked behind the apartment complex, Bennett also witnessed a high

---

[3] In response to Petitioner's Motion to Suppress in his underlying criminal matter (Case No. 2:14-cr-0100-MJP), the prosecuting attorney incorrectly represented that Det. Conley learned of the "Boo-yah"/Morgan connection through a database search. (CR_35.)  A correction was later issued, advising that the source of the information was as represented *supra*. (CR_96.) Officer Bennett testified at the suppression hearing as to his knowledge that Petitioner was associated with the name "Boo-yah." (Ex. 1 at 24, 113-114.)

[4] "CR" refers to the docket numbers in Petitioner's criminal case, CR14-100.

[5] This confirmed other information that EPD had received via an anonymous tip that Petitioner was driving a black Pontiac Trans-Am, License No. AOA8085. (Id. at 121.)

volume of "short-stay" visitors coming in and out of Unit #5, many of whom he knew from previous contacts to be drug users.  (Id. at ¶ 9.)  He also saw a person resembling Petitioner leaving the apartment and returning shortly thereafter; consistent, in his experience, with the behavior of a drug runner meeting customers at remote locations.  (CR_193 at 3.)

On November 26, 2013, around 5:15 p.m., Bennett and DOC Community Corrections Specialist Scott Lee located the black Pontiac behind the Lombard apartments.  (PSIR_¶ 10.) Hoping to locate Petitioner, Bennett and Lee surveilled the location for the next two hours, observing a high volume of foot traffic entering and exiting Unit #5; again, behavior consistent with narcotic activity.  (Id.)   The officers could see into Unit #5 from their location and observed Petitioner answering the door on numerous occasions, as well as enter the bedroom.  (Id.) During the surveillance, Petitioner was observed exiting Unit #5, going out to the Pontiac and using a key to enter the vehicle, following which he used a key to re-admit himself to Unit #5; observations which led them to conclude that Petitioner was both the primary resident of Unit #5 and associated with the black Pontiac.  (Id.)

Two hours later, at approximately 7:25 p.m., Petitioner exited Unit #5, appearing to lock the door.  He was carrying a black North Face backpack.  (CR_193 at 4.)  Petitioner then walked to the Pontiac, opened the trunk, placed the backpack in the trunk, entered the driver's side of the car and turned on the lights.  (PSIR_¶ 11.)  At this point, Lee pulled in behind the Pontiac and activated his emergency lights.  (Id.)  After identifying themselves and advising Petitioner of the warrant for his arrest, Bennett and Lee advised him of his Miranda rights and took him into custody.  (CR_193 at 4.)

During the search of Petitioner incident to his arrest, the officers found $120 in U.S. bills, a Samsung flip phone, and keys to Unit #5 and the Pontiac.  (Id.)  A search of the interior of the

Pontiac revealed a U.S. Postal Service envelope with legal paperwork concerning Petitioner, identification and documents with the names of other individuals, and a Samsung Touch cell phone. (Id.) The backpack Petitioner had been carrying was recovered from the trunk, searched, and found to contain: (1) $2065 in U.S. currency in a zippered compartment, (2) $136 in $1 bills in a brown zippered bag, (3) vehicle registration listing the Pontiac's registered owner as Soldiers of Misfortune (registered agent: Duane Bradley), (4) a digital scale coated with both brownish and white residue (which later tested positive for heroin and methamphetamine), (5) several plastic bags containing a crystalline white substance (later weighed and tested as 58.9 grams of pure methamphetamine), (6) several plastic bags containing a brown substance (later weighed and tested as 68.2 grams of heroin), (7) a plastic bag with approximately 48 pink pills (later tested positive for oxycodone), (8) several identification documents belonging to other individuals, and (9) a loaded Kahr 9mm pistol (later confirmed to have been among the weapons stolen from the Snohomish Fred Meyer store). (PSIR_¶ 12.)

A search of Unit #5 revealed drug packaging materials and user quantities of narcotics. A green notebook which appeared to be a drug transaction ledger was discovered in the master bedroom. (Id.) Warrants were later requested and obtained to search the cell phones seized from Petitioner's person, Petitioner's girlfriend, the black Pontiac and Unit #5. (CR_193 at 6.) Information contained on Petitioner's flip phone included names which also appeared in the ledgers found in the apartment, and text messages consistent with drug trafficking activity. (Id.)

Procedural History

Petitioner was represented, during the portion of his pretrial proceedings at issue here, by attorney Michael Iaria. Iaria made a number of discovery requests and filed several pretrial motions on Petitioner's behalf, including requests for records relating to Bennett's contact with

the CI who provided information on Petitioner's whereabout and for further information about the anonymous tip that connected Petitioner with the black Pontiac.

At the Government's behest, Bennett prepared a follow-up report concerning the CI interview and other information which contributed to his knowledge of Petitioner's whereabouts and his suspicion that he was criminally active. (Dkt. No. 24-2, Ex. 2.) The report detailed the circumstances under which the original notes Bennett had taken of the CI interview came to be destroyed. (Id. at 1.) Bennett's report also explained that he had not retained a copy of the printout containing the anonymous tip concerning Petitioner and the Pontiac as it was simply active intelligence and "not part of a long term investigation." (Id. at 2.) Further inquiry was made to ascertain whether there was a record of the anonymous tip, but it did not result in any further discovery. (Dkt. Nos. 24-3 and 24-4.)

Petitioner's attorney filed a motion requesting disclosure of the identity of the CI and production of the informant to testify. (CR_86.) This Court denied the motion in a written order which held that the CI's identity and related evidence was relevant only as regards to the decision to surveil the Lombard apartment and was irrelevant to the issue of the sufficiency of the evidence to sustain a warrantless search. (CR_95 at 4.)

On May 5 and 7, 2015, the Court presided over a hearing on Petitioner's motions to suppress. (CR_109. 110.) Bennett testified regarding his interview with the CI, including the information he received regarding Petitioner's drug sales activity, his approximate whereabouts, and the Pontiac that he was driving. (Dkt. No. 24-1 at 99-100.) Bennett again explained why he had not retained records of the CI interview or the anonymous tip regarding Petitioner's vehicle. (Id. at 105, 107.) Following oral argument from counsel (and further argument from Petitioner

regarding his belief that Bennett was lying about both the CI and the anonymous tip)[6], the Court entered findings of fact and conclusions of law denying the suppression motions.  (CR_110.) Regarding the unavailability of the records sought by Petitioner, the Court had

> …no difficulty at all believing that police officers lose material, that they are not – that digital records are not kept for an extensive period of time.  In this case we are here today in 2015, the events occurred in 2012.[7]  The inability to locate those items, unfortunately perhaps, is all too common.  But I don't have any difficulty believing that the officers received the tips.

(Dkt. No. 24-5 at 89.)

As Petitioner's criminal trial date approached, his counsel filed a number of motions in limine, among them a motion to "prohibit members of law enforcement from reciting hearsay statements made by confidential informants."  (CR_118 at 13.)  In its response, the Government indicated that it had no intention of introducing any evidence of either statements made by the CI or anonymous tips.  (CR_132 at 10-11.)

A week prior to trial, a pretrial conference was held at which Petitioner's request to proceed *pro se* was addressed.  Following a <u>Faretta</u> inquiry, this Court found that Petitioner had knowingly and voluntarily waived his right to counsel and granted his request to represent himself.  (CR_135.)

Following his opening statement at trial (in which Petitioner himself introduced the existence of the CI and the anonymous tip, along with his assertion that the police were lying about both[8]), Petitioner requested that Iaria serve as "standby counsel" during the trial (CR_141), a motion which the Court granted.   Petitioner cross-examined Bennett about both the CI and the

---

[6] Dkt. No. 24-5 at 77, 79 81, 84.

[7] In fact, Petitioner's arrest occurred in 2013.

[8] Dkt. No. 24-6 at 89-90.

anonymous tip, including extensive questioning about the information provided him by the CI such as the fact that the CI had bought drugs from Petitioner.  (Dkt. No. 24-6 at 186, 193-196; Dkt. No. 24-7 at 65-67, 70-75.)

Partway through the trial, Petitioner renewed his request for disclosure of the CI, a motion which was again denied.  (Dkt. No. 24-7 at 58-59.)  Petitioner then modified that request and asked the Court to compel the Government to produce any reports which would corroborate Bennett's testimony that he had arrested the CI on a VUCSA/heroin charge.  (Dkt. No. 24-8; Dkt. No. 24-9 at 215-217.)  Because the report in question could not be redacted to avoid disclosing the CI's identity, it was submitted for *in camera* review.  Following the review, this Court advised Petitioner that the report indicated there was a real person contacted on the date indicated by Bennett and that that person had a conversation with Bennett, but the report contained no information that Petitioner was discussed during that conversation.  (Dkt. No. 24-10 at 73-76.)

On June 15, 2015, Petitioner was found guilty on all counts: Felon in Possession of a Firearm, Possession of Methamphetamine with Intent to Distribute, Possession of Heroin with Intent to Distribute, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. (CR_151.)  On September 29, 2015, Petitioner was sentenced to a prison term of 180 months. (CR_197.)

**Discussion**

Petitioner's claims for habeas relief fall into two categories: (1) a denial of due process as a result of prosecutorial misconduct, and (2) ineffective assistance of counsel.

Denial of due process

The allegations of misconduct against the Government involve Petitioner's assertions that the prosecutors in his case (a) failed to turn over required discovery in violation of <u>Jencks</u> and <u>Brady</u>, and (b) utilized false testimony in order to obtain his conviction.  Habeas petitioners seeking relief on grounds of prosecutorial misconduct are required to establish that misconduct occurred and that the misconduct violated the petitioner's due process rights.  <u>Moreno-Morales v. United States</u>, 334 F.3d 140, 148 (1st Cir. 2003).

*Discovery*

Petitioner alleges that the prosecution "elected to ignore completely" and "not to comply with [the] Court Order to produce, review, and disclose records and report in the possession of Government witnesses," which failure resulted in violations of <u>Brady</u> and the Jencks Act.  (Dkt. No. 21 at 18, 19.)

Petitioner appears concerned primarily with the disclosure of records related to the CI and the anonymous tip which connected him to the sale of the stolen weapons and permitted the police to ascertain where he was living and what vehicle he was driving.  A review of the record reveals that the Government responded to requests for information related to both the CI and the anonymous tip, including producing a report from Bennett detailing the circumstances of both these sources of information (and the fact that he was no longer in possession of notes from the CI interview or any print version of the anonymous tip).  (Dkt. No. 24-2.)  While Petitioner clearly believes that the agencies are lying about the source of their information and the reasons why there is no written record of the information currently, this Court has already found the explanation plausible and the existence of the tips credible.  (Dkt. No. 24-5 at 89.) The Court

1    finds no support in the record or the evidence presented by Petitioner for a finding that the

2    prosecution withheld discovery from Petitioner.

3        Petitioner also appears to believe that incorrect statements by the Government during the

4    course of his criminal pretrial proceedings constitute evidence of misconduct; namely, the initial

5    indication of how Det. Conley learned of the "Boo-yah"/Morgan connection and the indication

6    that both Elshaugh and Baron had identified Petitioner from photographs.  What is clear from the

7    record is that, upon learning of its mistakes, the Government promptly corrected them through

8    the filing of supplemental briefs.  (CR_96, 103.)  Nor has Petitioner indicated how these initial

9    errors, corrected in advance of his suppression hearing, prejudiced his defense in the slightest.

10       Additionally, Petitioner contends that the prosecution "elected to ignore the Court's

11   order" to review the personnel files of the officers involved in the investigation.  (Dkt. No. 26 at

12   25.)  The Court did indeed question whether the Government's practice of having the agencies

13   review the files of their officers was sufficient (*see* CR_93), but Petitioner has no evidence that

14   the Government disregarded that admonition.  His "proof" that the prosecution "continue[d] to

15   have Officers C.B., Lee and Conely [*sic*] review files and disclose however they please" (Dkt.

16   No. 26 at 25; Ex. 9) is composed solely of emails relating to searches of the records regarding the

17   anonymous tip, not any personnel files.  Petitioner's evidence fails to support his argument that

18   the prosecution engaged in any misconduct concerning its review of the personnel files of its law

19   enforcement witnesses.

20       Petitioner's contention that the police report concerning the arrest of the CI was produced

21   for *in camera* review on a date when his "standby counsel" (Mr. Iaria) was not present is

22   contradicted by the trial transcript.  (Dkt. No. 24-10 at 1, 5.)  Petitioner fails to identify any court

23

24

order violated by the *in camera* submission – it did not impeach Bennett and the Court can find no misconduct on the prosecution's part related to its production.

### ***Napue* *violation***

Petitioner's second claim as to prosecutorial misconduct concerns the introduction of testimony which Petitioner alleges the Government knew or should have known was perjured, and the resulting violation of his right to due process. <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). To succeed on this claim, Petitioner must prove, not only that the testimony or evidence was actually false, but that it was material and the prosecution knew or should have known of its falsity. <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003)(*citing* <u>Napue</u>, 360 U.S. at 269-71).

Petitioner's allegations focus on three contentions:

i.      <u>Bennett's testimony regarding the CI</u>

Petitioner has submitted the affidavit of an individual named Michael Michell, whom he claims is the arrestee interviewed by Bennett. (Dkt. No. 26-1 at 158.) The affidavit contains Michell's declaration that, while he was arrested on November 19, 2013 by Bennett, he "did not identify or provide any information to Officer Bennett about Seth Morgan/'Boo-yah' in our November 19th interview" and made no photo identification of Petitioner. (<u>Id.</u>)

The Court accords little weight to Michell's affidavit. With a criminal history which include 12 different aliases, numerous felony convictions, and misdemeanor convictions for crimes of dishonesty (theft and false/misleading statements to a public official), Michell's credibility is highly suspect. (Dkt. No. 24-11.) Petitioner's own counsel related his concerns about his client's attempts to suborn perjury in an affidavit submitted in conjunction with the ineffective assistance claims. (Dkt. No. 24-12 at 35-38.) Unreliable evidence, procured under

1  circumstances suggesting a motive to fabricate (an in-custody former CI now claiming he did not

2  cooperate with the authorities), is not proof of false testimony.  <u>Zuno-Arce</u>, 339 F.3d at 889-90.

3  Moreover, even if the Court were to credit Michell's version of the facts, Petitioner has

4  still failed to demonstrate that the Government knew or should have known that Bennett's

5  testimony was false.  This proposition is further undermined by the fact that the information

6  which Bennett claimed to have gotten from the CI was confirmed by other witnesses (Baron and

7  Elshaug), and that Petitioner was found to be residing in the area identified by the CI, driving the

8  car described by the CI (not to mention that one of the stolen weapons was found in his

9  possession).  These indicia of credibility could well have led the prosecution (as, indeed, they led

10  the Court) to understandably believe that Bennett was telling the truth.

11  Finally, Petitioner's evidence fails to satisfy the requirement of materiality; i.e., a

12  showing that the testimony affected the judgment of the jury, or (put another way) that the

13  outcome of the trial would have been different had this testimony not been introduced.  The

14  Court will discuss the materiality deficiency that runs throughout this habeas petition in greater

15  depth at the conclusion of this section of the order, but suffice it to say for now that the Court

16  finds that Bennett's testimony regarding the information he received from the CI (as well as the

17  anonymous tip) was irrelevant to whether the behavior observed by the police was sufficient to

18  justify a warrantless search or, ultimately, Petitioner's conviction of the crimes charged.

19  ii.    <u>Lee's testimony regarding the timing of the surveillance and the arrest</u>

20  It is Petitioner's contention that DOC Community Corrections Specialist Lee lied when

21  he testified that "he was unaware of the investigation [concerning Petitioner] prior to

22  approximately 5 pm on November 26."  The motive for this alleged deception was to avoid

23  having to contact his supervisor to obtain permission to conduct the arrest and the search.  The

24

transcript of Lee's testimony is considerably at odds with Petitioner's characterization.  Lee was aware of the DOC warrant already out for Petitioner (also another Snohomish County warrant for identity theft) and had been informed by EPD of Petitioner's suspected involvement in the theft of firearms from Fred Meyer and of the information received regarding his whereabouts and his vehicle.  (Dkt. No. 24-1 at 204, 208.)  Petitioner fails to demonstrate that any of this testimony was false nor does he challenge the validity of the DOC warrant already issued for his arrest prior to his suspected involvement in the crimes for which he was convicted.

And, again (assuming *arguendo* that the testimony was untruthful), Petitioner provides no evidence that the prosecution knew or should have known that was so, or that any testimony regarding what Lee knew or did not know prior to the arrest was material in any way to the jury convicting Petitioner of the crimes with which he was charged.

###### iii.    The "Karim Davis theory"

Petitioner makes repeated reference to a theory of his case that posits an ulterior motive to all the actions of all the law enforcement agencies who cooperated in his arrest; namely, that the real target of the investigation was a neighbor in the Lombard apartment complex, Karim Davis, who was the actual suspected recipient of the stolen weapons.  (Dkt. No. 26 at 31.)[9] Petitioner uses this theory as an explanation of why so many law enforcement officers from so many different agencies would conspire to tell so many lies to justify his arrest.  However, Petitioner has no evidence, only supposition, to support this theory and it is totally inadequate as proof of perjury or of the requisite element of knowledge on the part of the prosecution of the alleged perjury.

---

[9] There is a more detailed explanation of this conspiracy theory in Mr. Iaria's affidavit.  (Dkt. No. 26-12 at 1, 20-21.)

Petitioner's arguments concerning the purported denial of due process throughout his prosecution suffer from a number of deficiencies. One is an absence of proof that the Government flaunted the orders of the Court by failing to produce requested and required discovery. Another is his inability to demonstrate the falsity of the testimony he is challenging and (even if that falsity were to be assumed for the sake of argument) how the prosecution knew or should have known that the evidence presented was untrue.

Furthermore, the case law upon which Petitioner relies to support his claims of constitutional violation requires a finding of denial of due process

> when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses *touching the subject matter of their testimony at the trial.*

Jencks v. United States, 353 U.S. 657, 672 (1957)(emphasis supplied).

None of the material that Petitioner alleges he was denied, nor regarding which he alleges the testifying officers lied "touch[es] the subject matter of their testimony at trial." The Government made it clear prior to the commencement of trial that it did not intend to adduce any testimony from its witnesses regarding the theft of the Fred Meyer firearms, the fact that Petitioner was a suspect in the receipt of those stolen goods, nor how they came to be aware of where they could locate Petitioner. The reason for this is obvious: none of it was relevant or material to Petitioner's arrest and the fruits of the post-arrest search which was upheld prior to the trial. The only reason it was introduced at Petitioner's trial was that Petitioner chose to question the Government's witnesses in these subject areas. Petitioner cannot create constitutional error by choosing to introduce irrelevant topics into his trial and then complain that he was not provided sufficient discovery to corroborate them, or by alleging that the witnesses lied about them.

The only evidence material to Petitioner's trial and his conviction concerned the observations by law enforcement which led them to reasonably suspect he might be involved in criminal activity, the arrest of Petitioner pursuant to those observations, and the post-arrest search of Petitioner and his vehicle and apartment. Regardless of how they came to be there, Petitioner has never successfully challenged that the law enforcement agents who arrested him (1) had a right to be where they were when they observed Petitioner's activities (i.e., were not trespassing) and (2) saw what they testified they had seen which led them to believe that Petitioner was committing a crime. That is the evidence upon which Petitioner's conviction was based, and the fact that he has chosen not to challenge that evidence, but instead condition his right to habeas relief on evidence and activities totally irrelevant to the evidence of his criminal behavior, is fatal to his claim of a denial of due process.

Ineffective assistance of counsel

Petitioner's claim that his counsel was ineffective in presenting his defense requires him to demonstrate (1) that the conduct of his counsel fell "outside the wide range of professionally competent assistance" and (2) "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 685 (1984). The Court views this evidence in light of a "strong presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" United States v. Palomba, 31 F.3d 1456, 1460 (9th Cir. 1994)(quoting Strickland, 466 U.S. at 690).

As with his claims of denial of due process, Petitioner is once again tasked with showing, not only that the assistance he received was ineffective, but that whatever unprofessional conduct he can establish actually deprived him of a fair trial; i.e., that because of the assistance he

received or did not receive, the resulting conviction was unjust. The <u>Strickland</u> court put it this way: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Petitioner's proof in this regard rests on the assignment of ineffectiveness in the following areas:

### *Failure to fully investigate and present the "Karim Davis" theory*

As discussed *supra*, Petitioner adheres to a theory of his case which posits that the surveillance of his car and his apartment and his arrest were a mere subterfuge by law enforcement to gain access to his apartment building and to the apartment of a neighbor (Davis) who was the true object of the investigation; to that end (the theory goes) agents of several agencies wove a web of lies to justify their presence at the Lombard apartments and their entry into that complex. Their plan to search Davis's apartment was only thwarted (again, according to the theory) by their mistaken entry into Petitioner's unit. (Dkt. No. 21 at 16, 28; Dkt. No. 24-12 at 10-14.)

Petitioner's former counsel, in a lengthy affidavit, sets forth a list of reasons why he chose, as a matter of strategy, not to pursue this theory, not the least of which being that there was no evidence (and no personal knowledge on Petitioner's part) to support it. "The Karim Davis theory was not a fact that he wanted to testify to from personal knowledge, but, rather, simply his interpretation – his own personal case theory – of the evidence." (Dkt. No. 24-12 at 20-21.) In addition to the complete lack of evidence to support this hypotheses, Iaria was aware that introducing the theory at trial would permit the presentation of rebuttal evidence by the Government concerning Petitioner's lengthy criminal history (which included prior acts of

possession of stolen weapons and drug-dealing), not to mention the evidence of Petitioner's involvement in the sale of the firearms from the Fred Meyer burglary. (Id. at 11-14.)

Iaria's decision not to pursue his client's preferred strategy resulted in the Government's choice not to introduce any of that evidence, and the Court cannot view it as anything other than a legitimate tactical choice that falls well within the range of reasonable professional judgment. Nor can the Court, even supposing that a jury would have found the Davis theory credible, reasonably conclude that the weight of the evidence connecting Petitioner to the possession of a stolen weapon and drugs and paraphernalia clearly indicative of intent to sell would not have produced a similar result to that already obtained in Petitioner's criminal prosecution; i.e., the outcome would have been no different.

*Trial strategy regarding the 924(c) charge*

Petitioner claims that Iaria's choice – based on his professional assessment that (once the suppression motion had been denied) the evidence against Petitioner would most likely lead to his conviction – to concentrate on a strategy which argued that the gun found in his backpack was possessed with the intent to sell rather than to further his drug dealing gave him no choice but to represent himself. (Dkt. No. 21 at 36.) Iaria asserts that succeeding on this strategy could have avoided a five year mandatory minimum sentence dictated by the 924(c) count; Petitioner complains that it forced him to choose between a lawyer who thought he was guilty and acting as his own counsel.

The Court is unable to fault counsel's tactical decision in this regard. The evidence connecting Petitioner to the crimes with which he was charged was strong. Iaria's choice to attempt to minimize the damage to his client under these circumstances is within the acceptable range of reasonable professional judgment. The Court fully apprised Petitioner of the difficulty

and dangers of representing himself, and found that Petitioner acknowledged the same and knowingly and voluntarily waived his right to counsel. (CR_135.) The fact that Petitioner chose to decline to accept his attorney's professional recommendation and fend for himself does not equate to ineffective assistance on his counsel's part.

### ***Franks*** *hearing*

Petitioner assigns as further error on Iaria's part his "decision not to investigate the particular defense of a <u>Franks</u> hearing," which he asserts "cannot be deemed reasonable because it was uninformed." (Dkt. No. 21 at 32.) A <u>Franks</u> hearing is held to test the veracity of affidavits supporting a request for a search warrant (<u>Franks v. Delaware</u>, 98 S.Ct. 2874 (1978)); since there was no search warrant in Petitioner's criminal case, there is no deficiency in Iaria's decision not to request one. Refusal to raise a meritless defense cannot constitute ineffective assistance of counsel. <u>Hood v. United States</u>, 342 F.3c 861, 865 (8the Cir. 2003); <u>Acha v. United States</u>, 910 F.2d 28, 32 (1st Cir. 1990).

### *Confidential informant/veracity of officers*

Petitioner contends that Iaria's failure to discover the identity of the CI and his decision to "forgo investigation to attest the veracity of the warrant affidavits" [10] was the result of "inattention and neglect" on his counsel's part and prejudiced the outcome of his proceedings. The Court finds that Iaria's efforts (as detailed in his affidavit and as witnessed by the Court during the course of Petitioner's criminal proceedings) to discover the identity of the CI fell well within the range of reasonable professional conduct.

---

[10] Dkt. No. 26 at 38; as discussed *supra*, there were no "warrants" in this case (except the pre-existing DOC warrant and other active warrants which were already out for Petitioner prior to the initiation of the stolen firearms investigation). The Court assumes that Petitioner is referring to the officers' testimony in conjunction with his suppression hearing.

Iaria propounded a number of requests for public records from the EPD, as well as direct requests to the U.S. Attorney's Office and a motion to compel, attempting to ascertain the CI's name. (Dkt. No. 24-12 at 24-29.) The result of the investigation – that Bennett's notes of his conversation with the CI had been disposed of – was found to be credible by the Court, and Petitioner has made no challenge to the Court's denial of the motion to compel the identity of the CI.

Fatally, Petitioner fails to establish how any of this prejudiced him; i.e., how the outcome of his case would have been different had he obtained the information he sought. Iaria's concerns with Petitioner's propensity for intimidating and influencing witnesses is well documented in his affidavit (*see* id. at 35-39). The Government's responsive briefing in this matter (*see* Michell's criminal history at Dkt. No. 24-11) has added further weight to Iaria's speculation that he would not have called the CI to testify even had he known of his identity. And, again, even had he done so, Iaria continues to assert that he would not have pursued the "Karim Davis theory" for all the reasons previously stated. (Dkt. No. 24-12 at 39.)

### *Inattention and neglect*

Petitioner complains generally that Iaria did not devote sufficient time and attention to his matter, so much so that it resulted in a performance that fell below acceptable professional standards. He singles out the association of fellow defense counsel Robert Gombiner and legal researcher Craig Suffian as indicative of Iaria's failure to render him sufficient personal attention to meet the requirements of competent legal representation.

Based on this Court's observations of defense counsel's performance during the course of his representation and Iaria's declaration submitted by the Government in response to this petition, the Court finds no support for Petitioner's argument. It is neither uncommon nor

1  unprofessional to enlist the assistance of qualified colleagues (which Mr. Gombiner, in the

2  Court's opinion, certainly is) and research and writing assistants, to meet the demands of

3  adequate representation in a complex, demanding criminal matter.  Petitioner has presented no

4  evidence that his counsel's decision resulted in less than adequate representation or falls outside

5  the range of professionally competent assistance.

6      The Court finds that Petitioner has satisfied none of the <u>Strickland</u> criteria required to

7  establish ineffective assistance of counsel.  Not only has Iaria demonstrated his strategic choices

8  while Petitioner's legal representative to be within the realm of reasonable professional

9  judgment, the Court is convinced that he rendered adequate representation under challenging

10  circumstances and that the result was neither unwarranted nor unjust.

11  <u>Evidentiary hearing</u>

12      It appears from his briefing that Petitioner is requesting an evidentiary hearing in

13  conjunction with this petition.  (Dkt. No. 26 at 41, Dkt. No. 31 at 6.)  No evidentiary hearing is

14  required where the petition does not contain allegations sufficient to state a claim upon which

15  relief may be granted, and where those allegations can be refuted from the available record.

16  <u>United States v. Leonti</u>, 326 F.3d 1111, 1116 (9th Cir. 2004).  Both those factors are met here.

17      Accordingly, the Court will not schedule an evidentiary hearing on Petitioner's claims

18  and will issue its ruling on the record as developed in this matter and the underlying criminal

19  case.

20  <u>Certificate of Appealability</u>

21      Rule 11(a) governing 28 U.S.C. § 2255 proceedings states that "[t]he District Court must

22  issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

23  The rule states that the Court "may direct the parties to submit arguments on whether a certificate

24

should issue;" the matter of further briefing is within the Court's discretion, and the Court finds that further briefing on the issue of a certificate of appealability is unnecessary.[11]

> To obtain a certificate of appealability, a petitioner must show at least that "jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  That is, it must find that reasonable jurists would find the district court's assessment of the petitioner's constitutional claims debatable or wrong or because they warrant encouragement to proceed further. Banks v. Dretke, 540 U.S. 668, 705 (2004); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

Hand v. Houk, 2014 U.S. Dist. LEXIS 623, at *3-4 (S.D. Ohio Jan. 3, 2014).  It is the finding of this Court that the instant petition fails entirely to demonstrate that Petitioner was afforded anything less than the full panoply of constitutional rights due to him in the course of his prosecution, and that reasonable jurists would find the Court's assessment neither debatable nor wrong.

On the basis of that finding, Petitioner is DENIED a certificate of appealability in this matter.

Late-filed discovery motion

On December 17, 2018, over a month and a half after filing his reply brief in this matter, Petitioner filed a Motion for Discovery and Production of Documents Pursuant to Rule 6 Governing 28 U.S.C. 2255 Proceedings.  (Dkt. No. 32.)

While USCS Sec. 2254 Case Rule 6 does provide, "for good cause," authority to conduct discovery in habeas matters, it is not an unlimited right.  Discovery is traditionally limited to a discrete period of time prior to the submission of dispositive motions or the commencement of trial; or, in this case, prior to the completion of briefing regarding the habeas petition.

---

[11] On that basis, the Court DENIES Petitioner's Motion for Enlargement of Time to File a Motion for Certificate of Appealability.  (Dkt. No. 36.)

1     Petitioner originally filed this petition on March 8, 2018.  He was granted permission to

2     amend the petition on May 8, 2018, and submitted his final version of the amended petition on

3     August 30, 2018.  He was granted an extension of time to reply to the Government's answer on

4     September 25, 2018 and filed his reply brief on November 2, 2018.  At no time during this

5     process did he move for permission to conduct discovery until, 45 days after the filing of his

6     final brief, he decided that he needed additional information.

7          His grounds for that request appear to be based on his dissatisfaction with the

8     Government's response to his allegations, which has left (he asserts) "factual allegations at bar

9     [that] remain unresolved" and thus "a violation of due process."  (Dkt. No. 32-1 at 2.)  His legal

10    authority for the motion rests on Supreme Court jurisprudence "requiring a cumulative

11    evaluation of the materiality of wrongfully withheld evidence" (id. at 30), but he presents no

12    authority for his right to obtain, at any point he chooses, additional discovery.

13         Petitioner clearly reviewed the Government's response prior to filing his reply brief.  He

14    did not request, prior to filing that brief, a continuance to obtain the discovery to which he now

15    asserts a right.  Nor did he move, in the body of his reply, for additional time to conduct

16    discovery.  He filed his reply brief, at which point the matter became ripe for ruling by this

17    Court.  He has cited no authority permitting him to reopen his case for the purpose of gathering

18    information which he apparently believed he required once he had read the Government's

19    response.

20         Petitioner's latest discovery motion is untimely and will not be entertained.  The Court

21    strikes it *sua sponte* and rules on Petitioner' habeas request on the briefing before it.

22

23

24

**Conclusion**

Petitioner has failed to establish the constitutional deficiencies he claims in his 2255 briefing. His evidence demonstrates neither a denial of due process nor ineffective assistance of counsel. Accordingly, his habeas petition is DENIED. Additionally, the Court finds that the issues raised by Petitioner do not demonstrate a valid claim of a denial of a constitutional right and DENIES a certificate of appealability.

The clerk is ordered to provide copies of this order to Petitioner and to all counsel.

Dated January 30, 2019.

The Honorable Marsha J. Pechman
United States Senior District Court Judge